IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| WILMINGTON TRUST CORPORATION, | ) | Criminal Action No. 15-23-RGA |
| DAVID GIBSON, | ) | |
| ROBERT V.A. HARRA, | ) | |
| WILLIAM NORTH, and | ) | |
| KEVYN RAKOWSKI, | ) | REDACTED |
| | ) | |
| Defendants. | ) | |

## **THIRD SUPERSEDING INDICTMENT**

The Grand Jury for the District of Delaware charges that:

### **INTRODUCTION**

At all times material to this Indictment:

#### COMMON INDIVIDUALS AND ENTITIES

1.     Wilmington   Trust   Corporation   ("WILMINGTON   TRUST,"   or   "WL"),
headquartered in Wilmington, Delaware, was a Bank Holding Company whose securities were
traded on the New York Stock Exchange ("NYSE") under the trading symbol "WL."

2.     Wilmington Trust Company ("WTC," and collectively with WILMINGTON
TRUST sometimes hereafter referred to as the "Bank") comprised WILMINGTON TRUST's
Delaware-based, wholly-owned retail and commercial banking subsidiary and was a financial
institution, as defined by Title 18, United States Code, Section 20, with deposits insured by the
Federal Deposit Insurance Corporation.   Beginning in or around December 2008, the Bank
participated in the United States Department of the Treasury's Capital Purchase Program
("CPP"), a subset of the Troubled Asset Relief Program ("TARP").

3.     ROBERT V.A. HARRA ("HARRA") was employed by the Bank as its President, Chief Operating Officer ("COO") and the Head of Regional Banking. In those capacities, HARRA oversaw all banking activities for WTC. He was also a member of the Bank's Board of Directors.

4.     DAVID GIBSON ("GIBSON"), a Certified Managerial Accountant, was employed by the Bank as its Executive Vice President ("EVP") and Chief Financial Officer ("CFO"). As CFO, GIBSON was responsible for the Bank's public reporting of financial information, including past due loans. He was further responsible for communicating the Bank's financial position and strategic vision to the Bank's Board of Directors and Audit Committee; served as the Bank's point of contact with its auditor, KPMG; and forged and maintained relationships with sell-side analysts, investors, the NYSE, rating agencies, and investment banking firms.

5.     WILLIAM NORTH ("NORTH") was employed by the Bank as its Chief Credit Officer, and was responsible for, among other things, the Bank's credit policies and administration; its loan recovery and collection efforts; and its monitoring and managing of past due loans, including the approval of the Bank's internal list of past due loans (the "Delinquency Report").

6.     KEVYN RAKOWSKI ("RAKOWSKI," and collectively referred to with HARRA, GIBSON, NORTH, and WILMINGTON TRUST as "the Defendants"), a Certified Public Accountant, was employed by the Bank as its Controller, and was responsible for, among other things, the Bank's compliance with regulatory reporting requirements and generally accepted accounting principles ("GAAP"), and the accuracy of its publicly reported financial information, including past due loans.

2

THE BANK'S REPORTING OBLIGATIONS

7.     As a financial institution, the Bank was subject to regulatory supervision by the Board of the Governors of the Federal Reserve System ("Board of Governors") and the Federal Reserve Bank of Philadelphia ("Reserve Bank") (collectively referred to as the "Federal Reserve"). The Bank was a "State Member Bank" of the Federal Reserve System, as defined by Title 12, United States Code, Section 1813(d). The Board of Governors was the primary federal banking agency charged with supervising and regulating the Bank to ensure that the Bank engaged in safe and sound banking practices and complied with federal banking laws. The Reserve Bank carried out the day-to-day supervisory functions of the Board of Governors with respect to the Bank, under authority delegated to it by the Board of Governors.

8.     The Bank was required to file, and did file with the Federal Reserve, a quarterly "Consolidated Report of Condition and Income for a Bank with Domestic Offices Only – FFIEC 041," which is commonly known as the "Call Report." Each Call Report set forth detailed financial data about the Bank's financial position and the results of its operations for that quarter. Schedule RC-N of the Call Report required disclosure of the Bank's total amount of loans that were, for that quarter, (a) 30 to 89 days past due; (b) 90 days or more past due; and (c) on nonaccrual status, that is, no longer accruing interest income.

9.     The Bank was also required to submit to periodic safety and soundness examinations conducted by the Federal Reserve and other state and federal financial regulators. The Bank was required to report information regarding past due loans to the Federal Reserve in advance of these examinations, which affected the Federal Reserve's conclusions regarding the Bank's safety and soundness.

10.     As a result of the Federal Reserve's 2009 full-scope examination, the Bank entered into a Memorandum of Understanding ("MOU") with the Federal Reserve on or about

3

October 21, 2009, that, among other obligations, required the Bank to submit its total amount of past due loans to the Federal Reserve on a monthly basis (the "Monthly Regulatory Reports").

11.     As a publicly-traded company that was listed on the NYSE, WILMINGTON TRUST was also required to comply with the rules and regulations promulgated by the United States Securities and Exchange Commission ("SEC"), which were designed, in substantial part, to protect the investing public.  Under those rules and regulations, the Bank was required to (a) make and keep books, records, and accounts which accurately and fairly reflected the transactions and disposition of the assets of the Bank; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the Bank's transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP; and (c) file quarterly and annual reports with the SEC that contained audited financial statements that accurately and fairly presented the financial condition of the Bank, as well as other reports that contained information about the Bank's management, Board of Directors, business operations, and financial performance.  An annual report is referred to as a "Form 10-K," while a quarterly report is referred to as a "Form 10-Q" (referred to collectively as "SEC Reports").

12.     The Bank was required to disclose accurately in its SEC Reports its total amount of loans that were past due for 90 days or more and still accruing interest; its total amount of loans on nonaccrual status; and its allowance for loan and lease losses ("ALLL").   These disclosures are among the important metrics used by investors to analyze the quality of the Bank's loan portfolio and the Bank's health generally.

<u>THE SUBMISSION OF FALSE PAST DUE LOAN INFORMATION</u>

13.     A "past due loan" is a loan in which the borrower has not made a required interest or principal payment in accordance with the loan's contractual repayment terms.  The Bank's

4

computerized internal accounting system, known as the "SHAW" system, treated a loan as past due based upon the loan's contractual terms.

14.     A "matured loan" is a term loan which has passed its contractual date for principal repayment. The SHAW system considered matured loans to be past due. The past due status of a matured loan was resolved only if the borrower repaid the principal amount in full, or if the Bank entered into a new legal agreement with the borrower, such as a Change in Terms Agreement ("CITA").

15.     Despite the fact that the SHAW system treated matured loans as past due, the Bank had a practice of manually overriding SHAW in order to "waive," that is, to not include matured loans that were internally designated as "current for interest" and in the "process of extension" as past due in public reports to the SEC and the Federal Reserve (hereafter the "Waiver Practice"). The Waiver Practice resulted in the Bank filing SEC Reports, Call Reports, and Monthly Regulatory Reports that contained materially false past due loan amounts.

16.     Moreover, the Bank did not disclose its Waiver Practice in its SEC Reports, nor did the Bank disclose the Waiver Practice to the Federal Reserve.

### DEFENDANTS CAUSED THE BANK TO CONCEAL PAST DUE LOANS FROM THE FEDERAL RESERVE AND THE PUBLIC

17.     The Defendants were aware of the Waiver Practice and knew that the Bank concealed certain types of past due loans from public reporting.

18.     The Bank's internal Delinquency Report, which was populated with all of the past due loan information from the Bank's SHAW system, was used by the Bank as an essential step in its reporting of past due loans to the SEC and the Federal Reserve. The Delinquency Report was sorted into two primary subreports: a "Balance Sheet" subreport, which calculated past due loan information in a format to be reported in public filings with the SEC, and an "FRB" subreport, which calculated the information in a format to be reported in Schedule RC-N of the

Call Report. Both subreports were filtered in such a way that past due loans subject to the Waiver Practice were removed from the Delinquency Report's total amount of loans considered to be past due for financial reporting purposes.

19.     The Defendants were aware that the approved Delinquency Reports were forwarded to the Bank's Office of the Controller and used to create the Bank's final report of Past Due and Nonperforming Loans ("Past Due Report"), and that the past due loan figures contained in the Past Due Report did not include past due loans subject to the Waiver Practice. The Defendants knew further that past due loans subject to the Waiver Practice were not included in the Bank's past due loan amounts as reported in its Call Reports and SEC Reports, and in the Monthly Regulatory Reports.

20.     As Chief Credit Officer, NORTH reviewed and approved the waiver of matured loans from the Delinquency Report. NORTH expressed concern repeatedly over the rising magnitude of matured loans at the Bank, the impact of the Waiver Practice on the Bank's public reporting, and the possibility that the Waiver Practice could be subject to scrutiny by outside parties.

A.     On or about January 20, 2007, HARRA sent an email to NORTH inquiring about the Bank's rise in commercial loans that were 30-89 days past due as of year-end 2006. In response, NORTH described as an "issue" the "amount of 'waived' loans we see each quarter," which was "more of an issue in DE." NORTH referenced a process that the Bank employed in the Fourth Quarter of 2006, but stated that the Bank "still ended up waiving a lot more than I'm comfortable with." NORTH stated that, "As much as anything I think that it comes down to too many RMs with portfolios that are too big, and potentially some folks that don't feel that jumping on matured facilities are a priority." HARRA's reply asked NORTH, in part, to discuss the "'waived loans' issue" with him in the upcoming week.

6

B.      On or about March 7, 2007, NORTH sent an email regarding the Bank's "matured loans as of 3/1/07," in which he stated that the "numbers of waived/matured loans has been too high over the last 4 quarters, and in order to avoid that becoming an 'issue' with examiners, audit, or exec. management I'd like to think that we can help ourselves by getting this under control."

C.      On or about June 7, 2007, NORTH sent an email relating to the Bank's past due loans as of May 30, 2007.  In the email, NORTH stated that the "ever popular 'quarter end' will be here before you known it, and you all know the drill.  Once again, I'm making an impassioned plea to get us to address all matured loans via renewal/extension, as I do not want to waive the levels that we have had to in recent quarters."

D.      On or about December 4, 2007, NORTH sent an email in connection with the Bank's Delinquency Report for December 2007, in which he stated that there was "[n]o need to belabor the importance of making sure that we're on top of our past dues (and matured loans) as of 12/31.  No need to give anyone reasons to get more jumpy that [sic] the 'street' already is about anybody with 'Bank' in their name.  The goal is zero payment past dues that aren't 'problems', and zero matured loans that we have not approved internally.  If we've done our underwriting and documents are out to be executed that's not a big problem, but the old 'we're working on it' just doesn't hack it."

E.      On or about June 30, 2008, NORTH sent an email in connection with the Delinquency Report for the Second Quarter of 2008.  In the email, NORTH stated that there were approximately 100 "in matured (int. current) loans that need to be addressed.  On the latter, if we've completed our approval process on these. [sic] But the documentation has not gotten processed, I'm OK with waiving.  All other 'I'm working on it' situations are not ones that we should be waiving.  As always, your help in

7

addressing all of these situations is greatly appreciated and extremely important as we report out our second quarter numbers."

F.      On or about September 23, 2008, NORTH sent an email regarding the Bank's Delinquency Report for the Third Quarter of 2008, in which he stated, in part, that "the matured loans have also remained at prior quarter end levels that are too high.  If we've approved a renewal or extension internally, please make sure that [Bank Employee A] knows this so we can waive it . . . Lots of goofy stuff going on in the market, and we certainly don't need an inflated level of commercial past dues on our books."

G.      The following day, on or about September 24, 2008, NORTH sent an additional email regarding the Third Quarter 2008 Delinquency Report to a Bank employee, in which he stated, "Again on matured situations, as of now I'm OK with waiving loans where we've done our internally [sic] underwriting and approval, but have yet to get new docs executed and processed.  I'm not so OK, with the 'we're working on it' situations regardless if interest is current."

H.      On January 16, 2009, NORTH edited an email which was later sent by another Bank employee with the subject line "Current but Matured Loans," in which he provided the following edits that are set forth in bold:

> "We would like to hold a brief meeting on Wednesday 1/21 immediately following Loan Committee to discuss **addressing** the practice of waiving loans that are matured but current for interest from our past due reporting.  I **had thought that for the last few quarters that we were trying to only waive bank errors or** loans that had made it through the approval process **but** were not booked in time to come off delinquency.  **Apparently that has not exactly been reality**.  At 12/31/08 the total of **matured/waived** stood at over $105 million and nearly 80 loans.  With your input, we would like to set a reasonable goal/**game plan** for getting these loans renewed/extended and allowing the system to report a true past due number without a lot of adjustments **that could raise issues for us at some point in the future**."

Despite these concerns, NORTH continued to approve the Delinquency Report, knowing that a material amount of loans subject to the Waiver Practice were of poor quality and/or had been waived from the Delinquency Report for multiple quarterly reporting periods.

21.     RAKOWSKI, as Controller, was responsible for, among other things, approving the Bank's Past Due Report. RAKOWSKI approved the Past Due Report knowing that it did not include loans subject to the Waiver Practice, and that, as a result, the Bank falsely reported its total amount of past due loans in its Call Reports and SEC Reports, and in its Monthly Regulatory Reports.

22.     GIBSON participated in the Bank's drafting of SEC Reports with respect to both qualitative and quantitative disclosures, including the Bank's quantity of past due loans. As CFO, Gibson approved and electronically signed the Bank's SEC Reports and Call Reports for the Third and Fourth Quarters of 2009 and the First and Second Quarters of 2010, which contained disclosures regarding the Bank's total amount of past due loans. For each SEC Report, GIBSON also electronically signed a certification pursuant to 18 U.S.C. § 1350 stating that the information contained in each of the reports "fairly presents, in all material respects, the financial condition and results of operation of Wilmington Trust." GIBSON took these actions knowing that the Bank had not disclosed its Waiver Practice in SEC Reports or to the Federal Reserve, and that the past due loan figures reported by the Bank in its SEC Reports, Call Reports, and Monthly Regulatory Reports did not include loans subject to the Waiver Practice.

23.     HARRA received and reviewed the Bank's Past Due Reports; knew that the Bank reported its past due loan information publicly in its SEC Reports, Call Reports, and in the Monthly Regulatory Reports; and knew that such public reports did not include loans subject to the Waiver Practice. HARRA approved and electronically signed the Bank's 2009 Form 10-K in his capacities as President/COO and as a member of the Board of Directors, including a page certifying that the Bank's internal controls over financial reporting were effective. HARRA

9

further participated in earnings calls following the release of the Bank's financial information, and he was a primary point of contact with the Bank's examiners during examinations in 2009 and 2010.  HARRA never disclosed the Waiver Practice to the Bank's examiners or during the earnings calls.

## MATURED LOANS INCREASE SIGNIFICANTLY IN 2009

24.     Over the course of 2008, the Bank's volume of matured loans that were 90 days or more past due and concealed from public reporting pursuant to the Waiver Practice increased significantly.

25.     The rising volume of past due loans not reported under the Waiver Practice coincided with a downturn in the economy.  A large number of commercial real estate ("CRE") borrowers began to experience financial difficulties, including significant decreases in the underlying value of collateral pledged to secure loans, which would have made it difficult or unlikely for such borrowers to repay or for the Bank to restructure term loans upon maturity. Moreover, as the pace of residential home sales decreased, many CRE borrowers began having difficulty making interest payments without further Bank assistance.

26.     In an effort to accommodate CRE borrowers, the Bank's loan officers used supplemental financing – that is, additional loan funds that were not contemplated in the original construction loan agreements – to support construction loans in financial distress.  Many of these construction loans were term loans scheduled to mature in 2009 and 2010.

27.     The Bank's 2008 year-end audit (the "Audit") shed further light on the scope of its supplemental financing practice.  The Audit revealed that the Bank had loaned hundreds of millions of dollars in supplemental financing to CRE borrowers.  The supplemental financing provided by the Bank allowed CRE borrowers or, in some cases, the Bank itself, to make monthly interest payments on matured loans when CRE borrowers otherwise may not have been able, or willing, to make such payments.

28. The Defendants knew, through the 2008 audit and other available information, that the Bank had provided supplemental financing to CRE borrowers.

29. In early-2009, the Bank made numerous changes to its commercial loan policies that purported to restrict the ability of loan officers to provide supplemental financing to CRE borrowers.

30. Renewal of matured loans in accordance with the Bank's policies required a full underwriting process to determine the borrowers' qualifications for extensions and their capacity to make timely payments. In addition, in order to revise the loan maturity dates within the SHAW system, the Bank was required to enter into new loan agreements with its borrowers, or to extend loans using executed CITAs.

31. The Defendants knew, however, that the significant decrease in real estate valuations and changes to Bank lending policies made it difficult for the Bank to extend or restructure many lending relationships in 2009 without suffering negative financial consequences, including, but not limited to, placing loans on nonaccrual status, taking additional reserves against loan losses, and/or charging off losses relating to particular loans.

32. For example, on or about April 7, 2009, the Bank's Delaware Market Manager sent HARRA an email that contained information regarding declining appraisal information for properties pledged as collateral for Delaware CRE projects. The email stated that the attached appraisal information had the "near term potential for catastrophic consequences." The Delaware Market Manager wrote further that the Bank "put in a new reappraisal policy to address the 'current market conditions' of the CRE portfolio as defined by our friendly KPMG/Fed/State examiners. My concern all along has been the long term effects on us as, surprise surprise, the values are coming back lower. Its mark to market when there is no market … [W]e will paint ourselves into a corner if we revalue every real estate project at renewal time."

33.     Faced with declining economic conditions, and unwilling to suffer negative financial consequences, the Bank continued to employ the Waiver Practice rather than properly underwriting and extending or restructuring loans that were otherwise past due. The volume of loans subject to the Waiver Practice thus increased significantly in 2009, thereby increasing the difference, or variance, between the loans that were actually past due and those that were reported as past due by the Bank.

34.     In its SEC Reports, the Bank reported various categories of past due loans. For Commercial Loans, the Bank grouped past due loans into three different categories: "Commercial, financial, and agricultural;" "Commercial real estate – construction;" and "Commercial mortgage" (hereafter collectively as "Commercial Loans"). As set forth below, the Bank's Waiver Practice had a significant impact on the Bank's public reporting of its past due Commercial Loans:

A.     At the end of the First Quarter of 2009, the Bank's SHAW system recorded approximately $59.6 million in Commercial Loans that were 90 days or more past due; however, the Bank concealed approximately $48.3 million in past due Commercial Loans, only reporting approximately $10.3 million in total loans that were past due 90 days or more on its First Quarter of 2009 Form 10-Q.[1]

B.     At the end of the Second Quarter of 2009, the Bank's SHAW system recorded approximately $228 million in Commercial Loans that were 90 days or more past due; however, the Bank concealed approximately $217.2 million in past due

---

[1] The bulk of the unreported loans were those loans that had matured in 2009 or earlier. The Bank also did not report certain past due loans for other reasons, including, among others, that such loans were in Loan Recovery, encompassed purported billing errors, or involved situations where the Bank asserted that timely payments had yet to be processed.

Commercial Loans, only reporting approximately $10.8 million in total loans that were past due 90 days or more on its Second Quarter of 2009 Form 10-Q;

   C.   At the end of the Third Quarter of 2009, the Bank's SHAW system recorded approximately $384.4 million in Commercial Loans that were 90 days or more past due; however, the Bank concealed approximately $367.9 million in past due Commercial Loans, only reporting approximately $17.4 million in total loans that were past due 90 days or more on its Third Quarter of 2009 Form 10-Q;

   D.   At year-end 2009, the Bank's SHAW system recorded approximately $344.2 million in Commercial Loans that were 90 days or more past due, however, the Bank concealed approximately $333.4 million in past due Commercial Loans, only reporting approximately $10.8 million in total loans that were past due 90 days or more on its 2009 Form 10-K.

FEDERAL EXAMINATION LEADS TO ENFORCEMENT ACTION
AND FURTHER CONCEALMENT OF PAST DUE LOANS

35.     In or around September 2009, the Federal Reserve concluded its full-scope examination of the Bank, finding that the Bank's condition was "less than satisfactory." Among the reasons for its conclusion, the Federal Reserve found that the Bank's "use of working capital lines of credit and interest reserves" – forms of supplemental financing – "was prevalent in many of the relationships reviewed," and that "there was a tendency to extend multiple working capital loans/lines of credit and interest reserves to the same borrower." The Defendants also learned, by virtue of the 2009 full-scope examination, that:

- WTC faced a "deterioration in the quality of the loan portfolio;"

- the "current economic environment [which] has been challenging for all banks … has exacerbated [WTC's] inherently weak credit processes and reporting structure;" and

- the "[l]ack of independence" in the Bank's loan review function gave rise "not only [for] … the possibility of undue influence on loan review staff, but … also the possibility for accusations of earnings manipulation."

36.     As a result of its full-scope examination, the Federal Reserve required the Bank to enter into the MOU on October 21, 2009. The MOU, which was an enforcement action, required the Bank to satisfy a number of conditions, including that the Bank submit its past due loan information to the Federal Reserve on a monthly basis, beginning with past due loan figures for September 2009.

37.     In accordance with the terms of the MOU, the Controller's Group, led by RAKOWSKI and overseen by GIBSON, began preparing the Past Due Report on a monthly, as opposed to a quarterly, basis, beginning with past due loan information for September 2009. The

14

Bank forwarded a summary copy of the Past Due Report to the Federal Reserve as part of the Monthly Regulatory Report submission required by the MOU. The Monthly Regulatory Reports omitted loans subject to the Waiver Practice, and thus understated, by hundreds of millions of dollars, the Bank's actual amount of past due loans.

38.     The Defendants were aware of the magnitude of the loans subject to the Waiver Practice, as well as the fact that the waived loans were not reported by the Bank to the Federal Reserve before and/or after the MOU.

39.     Similarly, the loans subject to the Waiver Practice were not included in the Bank's Fourth Quarter of 2009 Call Report, or in any of the Monthly Regulatory Reports submitted to the Federal Reserve during the Fourth Quarter of 2009.

THE MASS EXTENSION PROCESS

40.     Five days after the Bank entered into the MOU, on or about October 26, 2009, HARRA sent two emails regarding past due loans. In the first email, to GIBSON, NORTH, and another Bank executive, HARRA indicated that he had spoken with the Bank's Delaware Market Manager and would be sending an additional email to other Bank market leaders with the message that "effective immediately, month end past dues must be kept to a minimum, and 'matured' credits must be renewed currently." HARRA subsequently sent the second email to those market leaders, copying NORTH, in which he stated that "matured commitments, renewals, or loans that require extensions need to be worked-on currently, and kept current and up-to-date! These are critical issues to me and I cannot over-emphasize their importance to the company. Work on the delinquencies monthly! Keep them current! Keep renewal commitments current! I will leave it to each of you to communicate this to your lenders."

41.     In or around late-October 2009, NORTH and other Bank employees developed a plan to implement HARRA's directive to eliminate past due and matured loans by the end of 2009. The Bank embarked on a plan to mass-extend, through short-term extensions, in excess of

15

$1.3 billion of loans that would be maturing by December 31, 2009. To implement the mass-extension plan, NORTH and other Bank employees approved, with limited to no underwriting, short-term extensions through year-end 2009 for many CRE loans for which the Bank did not have updated appraisals. These short-term extensions added to a pre-existing pool of approximately $432 million in loans that were scheduled to mature in or around March or April 2010.

42.     As a result of the mass-extension plan, past due loans subject to the short-term extensions were not reported as past due through the First Quarter of 2010. The Defendants were aware of the mass-extension plan and that the loans being extended had not advanced through a full underwriting process. In an email dated January 10, 2010, to HARRA, GIBSON, RAKOWSKI, and others, NORTH conceded that the Bank "did a lot of extensions until 4/1/10 so as to allow for proper/needed level of underwriting required on CRE credits," which NORTH indicated would not be completed until the Second Quarter of 2010. NORTH stated that the plan was necessary to "address a decades old issue" and to "avoid an annual tidal wave of maturities in the future."

43.     For some of these short-term loan extensions, where lenders obtained signed CITAs from borrowers, the maturity dates of the loans were changed on the SHAW system. In other situations, where the Bank failed to seek or obtain signed CITAs from borrowers, the Bank approved short-term extensions internally and continued to employ the Waiver Practice.

44.     The Defendants knew that, once loans were fully reviewed and documented, many CRE borrowers would not be able to obtain longer-term renewals on the same terms as the original loans. In an email dated December 16, 2009, NORTH expressed to HARRA that "[m]any of these credit turds will simply take some time to make/get better." In light of the economic downturn and the Bank's volume of matured/maturing loans, NORTH stated that "we (and the economy) didn't make this mess overnight and, unfortunately, we can't clean it all up in

a short time frame." In the same email, NORTH also acknowledged that many borrowers could not otherwise locate substitute banks to provide financing, stating, "We can ask most of our classified borrowers to pay us off, or leave, every day of the week, but they simply can't."

45.    In or around January 2010, the Bank developed a process known as the "Surge" to assist Delaware lenders in performing global cash flow analyses of the Bank's largest lending relationships. The Surge further confirmed to the Defendants and other senior Bank executives that the performance metrics and underlying collateral supporting many of the Bank's largest CRE lending relationships, including relationships extended at year-end 2009 and/or subject to the Waiver Practice, had deteriorated significantly.

CAPITAL RAISE

46.    In or around December 2009, GIBSON, HARRA, and other Bank executives began discussing raising capital through a public stock offering, the proceeds of which they intended, in part, for the Bank to use to help repay the $330 million in funds that the Bank had received through TARP.

47.    RAKOWSKI learned of the capital raise no later than on or about February 1, 2010; NORTH learned of the capital raise no later than on or about February 11, 2010.

48.    The Defendants participated in the drafting and/or review of the Bank's 2009 Form 10-K, and they knew that the Bank's overall credit quality, including its quantity of past due loans, would be an important metric for investors in making investment decisions with respect to the Bank's stock offered through the capital raise.

49.    On or about February 22, 2010, the Bank filed its 2009 Form 10-K with the SEC. The 2009 Form 10-K reported only $10.8 million in Commercial Loans that were 90 days or more past due at year-end 2009 – concealing in excess of $333.4 million in past due Commercial Loans subject to the Waiver Practice. In describing the Bank's portfolio of past due loans, the Form 10-K falsely stated that the Bank's quantity of past due loans had "declined modestly."

17

The purported decrease in past due loans from year-end 2008 to year-end 2009 was attributed to such loans being charged off or moved to nonaccrual status. There was no mention of the Waiver Practice or the Bank's decision to mass-extend loans on a short-term basis at year-end 2009. The Defendants knew that the Bank's public reporting materially understated its actual amount of past due loans, and each Defendant caused the Bank to issue these false statements.

50.    In addition, the 2009 Form 10-K falsely stated that the Bank "employ[ed] rigorous loan underwriting standards and appl[ied] them consistently;" falsely stated that the Bank "[r]egularly review[ed] all past-due loans [and] loans not being repaid according to contractual terms;" failed to disclose that the Bank had mass-extended loans at year-end 2009; failed to disclose that the Bank had been required to report past due loan information in Monthly Regulatory Reports to the Federal Reserve as a result of the MOU; and failed to disclose that the Bank's Surge process had revealed that many Delaware CRE relationships were experiencing declining performance metrics and collateral values.

51.    On or about February 23, 2010, the day after the Bank filed its 2009 Form 10-K, the Bank filed an Offering Prospectus with the SEC that outlined its plan to issue 18,875,000 shares of common stock at $13.25 per share. The Prospectus explicitly incorporated the Bank's 2009 Form 10-K, including the Bank's materially false statements regarding its quantity of past due loans and the quality of its loan portfolio.

52.    The Bank raised approximately $273.9 million from the public stock offering.

NONDISCLOSURE OF CHANGING TREATMENT OF MATURED LOANS

53.    On or about March 24, 2010, NORTH drafted a memorandum to HARRA and another Bank executive regarding the Bank's continuing issues with matured loans. The memorandum was submitted prior to a meeting on or about March 26, 2010, between NORTH, HARRA, GIBSON, and another Bank executive regarding "Loan Maturities."

54.    In a follow-up email to HARRA, NORTH noted that "its [sic] come to pass that some of the [Delaware] RMs never documented the 4/1/10 extensions. What we don't want are the Feds seeing a skew of matured loans on SHAW. They've never commented on matureds in the past, but I want to give them no opportunity in the future." HARRA replied, "Uggh. Got it. No need for further elaboration." Neither HARRA nor NORTH informed the Federal Reserve about the Waiver Practice, the mass-extension process, or the Bank's pool of matured and maturing loans.

55.    In its First Quarter of 2010 Form 10-Q, filed with the SEC on or about May 10, 2010, the Bank reported $24.3 million in Commercial Loans that were past due 90 days or more. The Form 10-Q disclosed, for the first time, that a portion of the Bank's past due loans were "performing, have matured but have not paid off, and for which underwriting extensions are underway." The Bank did not disclose in its Form 10-Q, or anywhere else, its continued use of the Waiver Practice (including approximately $40.4 million in Commercial Loans waived in the First Quarter of 2010), or that previously none of the past due loans subject to the Waiver Practice had been publicly reported. Similarly, these loans subject to the Waiver Practice were not included in the Bank's First Quarter 2010 Call Report, or in any of the Monthly Regulatory Reports submitted to the Federal Reserve during the First Quarter of 2010.

56.    In an earnings call with investors on or about April 23, 2010, in which HARRA, GIBSON, NORTH, and other Bank executives participated, NORTH responded to an analyst's question regarding the quality of matured loans that were in the process of being extended by saying that "[t]he profile of these credits aren't necessarily credits with issues or problems," when NORTH, HARRA and GIBSON knew that, in fact, many of the matured loans were experiencing problems with declining performance metrics and collateral values.

57.    In its Second Quarter of 2010 Form 10-Q, filed on or about August 9, 2010, the Bank reported $89.7 million in Commercial Loans that were 90 days or more past due. The

Bank stated that "[t]he loans in this category are loans for which we believe the borrower has or will have the ability to comply with the terms of their loan agreements. For example, many of the loans in this category are performing loans that have matured and are in the process of being renewed. We expect approximately $39.3 million of the loans in this category to return to performing status when those extensions are completed." The Bank did not disclose its continued use of the Waiver Practice in its Second Quarter 2010 Form 10-Q. As in the prior quarters, the Bank failed to include waived loans in its reported past due loan figures in the Bank's Second Quarter of 2010 Call Report, and in its Monthly Regulatory Reports through the end of the Second Quarter of 2010.

58.   In an earnings call with investors on July 23, 2010, GIBSON fielded a question regarding the Bank's past due loan portfolio, during which he stated that "as a technical matter, a matured loan is past due principal." GIBSON did not disclose that the Bank's longstanding use of the Waiver Practice, including in the Second Quarter of 2010, had concealed from public reporting a material quantity of matured loans that met his own definition of a past due loan.

59.   In or around July 2010, the Bank eliminated the Waiver Practice. The Bank did not report publicly in its SEC Reports that it had adopted a new methodology of reporting past due loans when it eliminated the Waiver Practice, nor did the Bank ever correct its prior disclosures and/or publicly-reported financial information relating to past due loans from prior periods. Moreover, the Bank did not disclose the change in its past due loan reporting methodology to the Federal Reserve. As a result of the Bank's elimination of the Waiver Practice, the amount of reported past due and nonaccrual loans increased significantly.

60.   On or about October 31, 2010, M&T Bank Corporation ("MTB"), a New York corporation organized as a Bank Holding Company, entered into an Agreement and Plan of Merger (the "Merger Agreement") with WILMINGTON TRUST. Pursuant to the Merger Agreement, MTB agreed to assume all of the "claims, obligations, liabilities, debts, and duties"

20

of the Wilmington Trust Corporation." MTB acquired WILMINGTON TRUST at the price of $3.84 per share, which represented a discount of approximately 46% from the Bank's share price the prior trading day. The stock price at the time of the merger announcement was approximately $9.41 per share less than at the time of the capital raise, which represented a decrease of approximately $204 million in total market value of shares purchased during the February 2010 capital raise.

61.    In an email to several Bank employees following the announcement of the merger in November 2010, GIBSON noted that the Bank had a "significant number of loans that have maturity dates before year-end[.]" He stated further that it was "imperative that we get the documentation completed to renew these credits to prevent our loan quality statistics from worsening. Most of these loans are performing but could be classified due to 'delinquencies'. The rules can be fairly strict on this issue so we need your help in pushing this through."

62.    The overall credit quality of the Bank's loan portfolio continued to deteriorate through year-end 2010. In its 2010 Form 10-K, filed in February 2011, the Bank reported a total of $1.145 billion in nonperforming assets – an increase of $626 million, or 45%, from the prior year. Nonaccrual loans comprised the largest portion of the increase, rising $554 million, or 45%, over the prior year. Many of the Bank's largest lending relationships, which had been subject to the Waiver Practice and therefore excluded from public reporting, were included in the Bank's nonaccrual loan figures filed following the merger announcement and through year-end 2010.

63.    On or about May 16, 2011, MTB completed its acquisition of WILMINGTON TRUST. Following the acquisition, WILMINGTON TRUST became a wholly owned subsidiary of MTB. WTC became a wholly owned subsidiary of MTB's banking subsidiary, M&T Bank Co.

21

## COUNT ONE

### (Conspiracy to Defraud the United States, Commit Securities Fraud, and Make False Statements to Regulators)

64.     The allegations contained in paragraphs 1 through 63 of this Indictment are repeated and realleged as if fully set forth herein.

### THE CONSPIRACY

65.     From in or around October 2009, through in or around November 2010, in the District of Delaware, Defendants DAVID GIBSON, ROBERT V.A. HARRA, KEVYN RAKOWSKI, WILLIAM NORTH, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, knowingly and intentionally combined, conspired, confederated and agreed with individuals known and unknown to the Grand Jury to defraud the United States and to commit the following offenses against the United States: fraud in connection with the sale of Wilmington Trust securities, in violation of Title 18, United States Code, Section 1348; the making of false statements in required annual and quarterly reports with the SEC, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13a-1 and 240.13a-13; and the making of false statements to the SEC and the Federal Reserve, in violation of Title 18, United States Code, Section 1001.

### Objects of the Conspiracy

### Defraud the United States

66.     It was a part and an object of the conspiracy that GIBSON, HARRA, NORTH, RAKOWSKI, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, and others known and unknown to Grand Jury, unlawfully, willfully, and knowingly, directly, and indirectly, would and did defraud the United States, to wit, the Federal Reserve, by impairing, obstructing, and defeating its lawful governmental function of supervising and examining the safety, soundness, and health of Wilmington Trust; and the SEC,

by impairing, obstructing, and defeating its lawful government function to ensure that the Bank (1) maintained accurate books, records, and accounts, (2) devised and maintained a system of sufficient internal controls, and (3) filed quarterly and annual reports that fairly and accurately presented the Bank's financial condition.

### Securities Fraud

67.     It was further a part and an object of the conspiracy that GIBSON, HARRA, NORTH, RAKOWSKI, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, and others known and unknown to the Grand Jury, knowingly executed a scheme and artifice to defraud any person in connection with any security registered under Section 12 of the Securities Exchange Act of 1934, or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and to obtain, by means or false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any such security, in violation of Title 18, United States Code, Sections 1348 and 2.

### False Statements to Federal Regulators

68.     It was further a part and an object of the conspiracy that GIBSON, HARRA, NORTH, RAKOWSKI, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, and others known and unknown to the Grand Jury, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of Government of the United States, to wit, the SEC and the Federal Reserve, in violation of Title 18, United States Code, Sections 1001 and 2.

## Manner and Means of the Conspiracy

69.     GIBSON, HARRA, NORTH, RAKOWSKI, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, participated with other individuals known and unknown to the Grand Jury in the Waiver Practice, that is, to conceal from the SEC, the Federal Reserve, and investors matured loans that were purportedly current for interest and in the process of extension.

70.     The Defendant's participation in the Waiver Practice resulted in the Bank's concealment of a material quantity of its total amount of past due loans in its Call Reports and SEC Reports.

71.     GIBSON, HARRA, NORTH, RAKOWSKI, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, and others known and unknown to the Grand Jury, also failed to disclose the Waiver Practice and the Bank's actual quantity of past due loans to the Federal Reserve during examinations into the Bank's safety and soundness.

72.     The Waiver Practice further resulted in the Bank's failure to report a material amount of past due loans in the Monthly Regulatory Reports to the Federal Reserve as part of the MOU.

73.     The Waiver Practice also concealed from investors in the Bank's February 2010 capital raise the true nature of the Bank's loan portfolio.

## Overt Acts

74.     The conduct of the Defendants and of other individuals known and unknown to the Grand Jury caused the specific overt acts as set forth in paragraphs 1 through 63 of the Indictment, including but not limited to the following overt acts committed furtherance of the conspiracy:

A.     WILMINGTON TRUST filed with the SEC a Form 10-Q for the Third Quarter of 2009 and the First and Second Quarters of 2010, as well as a Form 10-K for 2009,

24

with each SEC Report materially misrepresenting the Bank's quantity of loans that were past due for 90 or more days.

B.     GIBSON electronically signed WILMINGTON TRUST's SEC Reports for each of the reporting periods referenced in Paragraph 74.A.

C.     HARRA and RAKOWSKI electronically signed WILMINGTON TRUST's 2009 Form 10-K.

D.     GIBSON also electronically signed a certification in WILMINGTON TRUST's SEC Reports for each of the reporting periods referenced in Paragraph 74.A stating that the information contained in each of the reports "fairly present[ed], in all material respects, the financial condition and results of operation of Wilmington Trust."

E.     GIBSON and HARRA further certified falsely in WILMINGTON TRUST's 2009 Form 10-K that the Bank's internal controls over financial reporting were effective, when each was aware that the Bank had experienced significant issues with the tracking, proper extension, and reporting of matured loans.

F.     WTC filed Call Reports with the Federal Reserve for each of the Third and Fourth Quarters of 2009, and the First and Second Quarters of 2010, which each materially misrepresented the Bank's quantity of loans that were past due for 90 or more days.

G.     GIBSON electronically signed WTC's Call Reports for each of the reporting periods referenced in Paragraph 74.F.

H.     WILMINGTON TRUST filed Monthly Regulatory Reports with the Federal Reserve for each monthly period between September 2009 and March 2010, which each materially misrepresented the Bank's quantity of loans that were past due for 90 or more days.

I.     NORTH supervised the preparation and approval of the past due loan amounts in the Bank's monthly Delinquency Report, knowing that such conduct would cause the Bank to materially misrepresent its quantity of loans that were past due for 90 or more days in

each of the public reports filed in the following periods: (1) WILMINGTON TRUST's SEC Reports for the Third Quarter of 2009, Year-end 2009, and the First Quarter of 2010; (2) WTC's Call Report for each of the Third and Fourth Quarters of 2009, and the First Quarter of 2010; and (3) WILMINGTON TRUST's Monthly Regulatory Reports for each monthly period between September 2009 and March 2010.

J.     RAKOWSKI supervised the preparation and approval of the Past Due Report knowing that the false past due loan information included therein would cause the Bank to materially misrepresent its quantity of loans that were past due for 90 or more days in each of the same following periods: (1) WILMINGTON TRUST's SEC Reports for the Third Quarter of 2009, Year-end 2009, and the First Quarter of 2010; (2) WTC's Call Report for each of the Third and Fourth Quarters of 2009, and the First Quarter of 2010; and (3) WILMINGTON TRUST's Monthly Regulatory Reports for each monthly period between September 2009 and March 2010.

K.     WILMINGTON TRUST submitted false information regarding loans that were 90 days or more past due to the Federal Reserve in advance of its targeted examination in early-2010 (as-of date of September 30, 2009) and full-scope examination in 2010 (as-of date May 31, 2010), and did not otherwise disclose the Waiver Practice during the course of the Federal Reserve examinations or while operating under the MOU.

(All in violation of Title 18, United States Code, Section 371.)

### COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

75.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

76.     From in or around December 2009 up to and including in or around February 2010, in the District of Delaware, Defendants DAVID GIBSON, ROBERT V.A. HARRA,

KEVYN RAKOWSKI, WILLIAM NORTH, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, did knowingly and intentionally execute, and attempted to execute, a scheme and artifice (a) to defraud persons in connection with the securities of WILMINGTON TRUST, an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934; and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, money and property in connection with the purchase and sale of the securities of WILMINGTON TRUST, an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934.

(All in violation of Title 18, United States Code, Sections 1348 and 2.)

### COUNT THREE

### (False Statements in Quarterly SEC Report)

The Grand Jury further charges:

77.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

78.     On or about November 9, 2009, in the District of Delaware, Defendant WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, caused to be submitted to the SEC the Bank's Form 10-Q for the Third Quarter of 2009, which materially misrepresented WILMINGTON TRUST's total loans that were 90 days or more past due.

(All in violation of Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.13a-1, -13; and Title 18, United States Code, Section 2.)

## COUNT FOUR

### (False Statements in Annual SEC Report)

The Grand Jury further charges:

79.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

80.     On or about February 22, 2010, in the District of Delaware, Defendants DAVID GIBSON, ROBERT V.A. HARRA, KEVYN RAKOWSKI, WILLIAM NORTH, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, GIBSON, HARRA, RAKOWSKI, NORTH, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, caused to be submitted to the SEC WILMINGTON TRUST's Form 10-K for the 2009, which materially misrepresented WILMINGTON TRUST's total loans that were 90 days or more past due.

(All in violation of Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.13a-1, -13; and Title 18, United States Code, Section 2.)

## COUNT FIVE

### (False Statements to the SEC)

The Grand Jury further charges:

81.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

82.     On or about February 22, 2010, in the District of Delaware, Defendants DAVID

GIBSON, ROBERT V.A. HARRA, KEVYN RAKOWSKI, WILLIAM NORTH, and

WILMINGTON TRUST, by and through its agents, employees, and subsidiaries knowingly and

willfully made and caused to be made, materially false, fictitious, and fraudulent statements and

representations in a matter within the jurisdiction of the Executive Branch of the Government of

the United States, by materially misrepresenting to the SEC the Bank's total quantity of loans

that were past due 90 or more days in WILMINGTON TRUST's 2009 Form 10-K.

(All in violation of Title 18, United States Code, Sections 1001 and 2.)

## COUNT SIX

### (False Statements in Quarterly SEC Report)

The Grand Jury further charges:

83.     The allegations contained in paragraphs 1 through 74 of this Indictment are

repeated and realleged as if fully set forth herein.

84.     On or about May 10, 2010, in the District of Delaware, Defendants DAVID

GIBSON, ROBERT V.A. HARRA, KEVYN RAKOWSKI, WILLIAM NORTH, and

WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, willfully and

knowingly made and caused to be made statements in reports and documents required to be filed

with the SEC under the Securities Exchange Act of 1934 and the rules and regulations

promulgated thereunder, which statements were false and misleading with respect to material

facts, to wit, GIBSON, HARRA, RAKOWSKI, NORTH, and WILMINGTON TRUST, by and

through its agents, employees, and subsidiaries, caused to be submitted to the SEC the Bank's

Form 10-Q for the First Quarter of 2010, which materially misrepresented WILMINGTON

TRUST's total loans that were 90 days or more past due.

(All in violation of Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of
Federal Regulations, Section 240.13a-1, -13; and Title 18, United States Code, Section 2.)

## COUNTS SEVEN TO TEN

### (False Entries in Banking Records)

The Grand Jury further charges:

85.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

86.     On or about the dates listed below, in the District of Delaware, Defendants DAVID GIBSON, ROBERT V.A. HARRA, KEVYN RAKOWSKI, WILLIAM NORTH, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, unlawfully and knowingly, made and caused to be made false and misleading entries in Call Reports and Monthly Regulatory Reports with intent to deceive, injure, and defraud the Federal Reserve, to wit, Defendants GIBSON, HARRA, RAKOWSKI, NORTH and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, caused to be submitted to the Federal Reserve the following filings which materially misrepresented the Bank's quantity of loans that were past due 90 or more days:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|-------|--------|----------------------------|
| SEVEN | WTC Call Report for the Third Quarter of 2009 | November 13, 2009 |
| EIGHT | WTC Call Report for the Fourth Quarter of 2009 | February 17, 2010 |
| NINE | WTC Call Report for the First Quarter of 2010 | April 30, 2010 |
| TEN | WTC October 2009 Monthly Regulatory Report | November 25, 2009 |

(All in violation of Title 18 United States Code, Sections 1005 and 2.)

## COUNTS ELEVEN TO SIXTEEN

### (False Statements to the Federal Reserve and the SEC)

The Grand Jury further charges:

87.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

88.     On or about the dates listed below, in the District of Delaware, Defendants DAVID GIBSON, ROBERT V.A. HARRA, KEVYN RAKOWSKI, WILLIAM NORTH, and WILMINGTON TRUST, by and through its agents, employees, and subsidiaries, knowingly and willfully made and caused to be made, materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the Executive Branch of the Government of the United States, by materially misrepresenting to the Federal Reserve and the SEC the Bank's total quantity of loans that were past due 90 or more days:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|---|---|---|
| ELEVEN | WTC Call Report for the Third Quarter of 2009 | November 13, 2009 |
| TWELVE | WTC Call Report for the Fourth Quarter of 2009 | February 17, 2010 |
| THIRTEEN | WTC Call Report for the First Quarter of 2010 | April 30, 2010 |
| FOURTEEN | WL Form 10-Q for the Third Quarter of 2009 | November 9, 2009 |
| FIFTEEN | WL Form 10-Q for the First Quarter of 2010 | May 10, 2010 |
| SIXTEEN | WL October 2009 Monthly Regulatory Report | November 25, 2009 |

(All in violation of Title 18, United States Code, Sections 1001 and 2.)

## COUNTS SEVENTEEN TO NINETEEN

### (False Certification of Financial Reports)

The Grand Jury further charges:

89.     The allegations contained in paragraphs 1 through 74 of this Indictment are repeated and realleged as if fully set forth herein.

90.     On or about the dates listed below, in the District of Delaware, Defendant DAVID GIBSON unlawfully and knowingly certified falsely that the periodic report containing the financial statement of WILMINGTON TRUST, an issuer of securities which filed periodic reports with the Securities Exchange Commission, fully complied with Section 13(a) or 15(d) of the Securities Exchange Act, when in fact Defendant DAVID GIBSON knew that the information contained in the Bank's periodic reports filed with the SEC did not fairly present, in all material respects, the financial condition and results of operations of WILMINGTON TRUST.

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|-------|--------|----------------------------|
| SEVENTEEN | WL Form 10-Q for the Third Quarter of 2009 | November 9, 2009 |
| EIGHTEEN | WL Form 10-K for 2009 | February 22, 2010 |
| NINETEEN | WL Form 10-Q for the First Quarter of 2010 | May 10, 2010 |

(All in violation of Title 18, United States Code, Section 1350.)

## NOTICE OF FORFEITURE

### *Notice of Forfeiture for Counts One Through Four and Counts Six Through Ten*

Upon conviction of the offenses alleged in Counts One through Four and Six through Ten of this Indictment, Defendants ROBERT V.A. HARRA, DAVID GIBSON, KEVYN RAKOWSKI, WILLIAM NORTH, and WILMINGTON TRUST shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(c), 982(a)(2), and Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations.

If any of the forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided with difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

Foreperson

CHARLES M. OBERLY, III
United States Attorney
District of Delaware

By: _____

Robert F. Kravetz
Lesley F. Wolf
Jamie M. McCall
Alexander P. Ibrahim
Assistant United States Attorneys

Date:  August 2, 2016

34